Blackman, on behalf of Mr. Paul, I also would like to try to reserve three minutes for rebuttal. It's going to be difficult for me to both talk to the Court and watch the clock, so if anybody can give me a high sign, I'd appreciate it. Okay. Go ahead. Let me begin by saying that I joined Mr. Piper's comments during the Tubbs argument that occurred, where he says that sentencing is very fact-specific, and the cases of the defendants involved in this set of appeals are very different, and Mr. Paul's situation probably the most different of all from all the other defendants, and we think that that's the primary failure of the trial court to take into account in rendering the sentence she did in his case. Well, the judge did render different sentences for the different defendants, so I take it you don't deny that the judge did treat the defendants individually. What she did, and what I think is a violation of the principles that this Court has long enunciated, is she compared defendants and proportionately sentenced them in her mind, even though they were convicted of very different offenses. And in our reply brief, I cover in some detail the many cases in which this Court has said disparity or proportionality or equality of sentencing can be utilized only for defendants convicted of the same offense or offenses. And here, of course, Mr. Paul was not convicted of either the quantity or quality of offenses that the co-defendants that the judge was comparing him to was. He was convicted of a single non-terrorism offense. He played the conspiracy, did he not? Yes. And we address in our brief. Okay. So under Pinkerton, I'm not sure I'm following your argument, Mr. Blackman. If the Court finds that the overall goals of the conspiracy to which the defendant had pled include a number of acts which under Pinkerton are reasonably foreseeable, how does your argument stand? Because the trial court probably found that the conspiracy count does not provide an independent basis for assessing individual liability. And this Court has many times said that when it comes to sentencing, in a conspiracy, you only attribute to the defendant the role in the conspiracy, not the fact that they were convicted of a conspiracy. And those acts which were reasonably foreseeable at the time the defendant joined. There's no suggestion, none whatsoever, in this record or by the government or in the trial court, by the trial court, that the acts of the other defendants were foreseeable to Mr. Paul when he engaged in the one incident in 1997 at Cavill West. None whatsoever. And no one's ever suggested that. And let me say that it has been difficult enough, given the law and the guidelines and the facts, to kind of keep all of this guideline discussion meaningful. But it's been even more complicated by the changing landscape that we're all living under. Mr. Blackman, we're suffering right along with you, believe me. And let me say, with Cardi now in mind, it seems to me that this Court has identified two levels of review, one for procedural error in the trial court, which, as I understand it, means that the court will vacate and remand if there was error in the calculation of the guideline range, whatever that means now, whether the – if the trial court appeared to treat the guidelines as mandatory instead of advisory, and if the – Well, clearly, she treated them as advisory, did she not? Well, it's not – it's not – You're not arguing she thought they were mandatory. Here's what's weird. Because the nature of the plea agreements, they treated the departure discussion and the trial court treated the departure as a guideline computation. But isn't that the problem we're all suffering from in terms of terminology? It's not really a departure anymore. It's an adjustment. You know, I mean, put whatever label you want on it, but it moves up and down beyond what a traditional mandatory guideline range would have dictated. But what the trial court did on all three of her sentencings is she did a calculation under the guidelines that brought her to a guideline range that allowed the sentence that she ultimately imposed, the 51-month sentence. But she did that in a variety of different ways. A 51-month sentence on a 20-year maximum, right? Yes. Okay. And we can get to substantive reasonableness in a moment, I hope. But procedurally, the way the trial court got there was, number one, in error because she utilized an improper methodology to begin with, a methodology that failed to give the defendant the three-level of acceptance, responsibility, downward adjustment under Chapter 3 that he was entitled to. And then that drove a sentence range that she then was determined by her own words on the record, determined to get to in a different method, which is why she then imposed this 12-level enhancement, which we believe is clearly an ex post facto violation given the history of the development of the guideline and the application note under 3A1.4. My worry, counsel, I guess, is that if there was error in first relying on the guidelines she did, which being a former district judge, you know, sometimes you do have error. And then good counsel suggests to you that you've done it wrong and that you need to do it again. And so she then comes back and recalculates the guideline. And at that point determines, and I quote her words, that it would not be fair or reasonable if some co-conspirators received the 12-level enhancement while others did not simply because they targeted the conduct of private individuals rather than the government, and then comes forward to suggest that she believes then she should enhance the sentence by such 12-level enhancement. Now, when I'm a district judge, I like to have counsel help me make a reasonable sentence. But the problem, and I understand your objection, procedural or substantive, I think we're still in procedural. At one time she does calculate what she believes to be the right procedural calculation. And then she says, even though that is my right procedural calculation, I believe based on reasonability now. We're not talking about calculating the sentencing guideline again, but based on reasonability, I believe these co-conspirators ought to have the same kind of enhancement, not simply because one's government and one's private. And now you're suggesting to me that that's not a procedural, that that's a procedural breakdown? I believe, number one, it's a procedural breakdown because the decision was driven by the original or erroneous calculation. But more importantly, it didn't individually factor in what the role was that Mr. Paul played. Third, in other words, he had nothing to do with the communique. The evidence was undisputed that he had left, gone home a week before that communique was ever written or issued. And that was the basis on which she found that Cabell West was, in fact, intended to intimidate private enterprise. So even assuming that that wasn't, in fact, an ex post facto violation, an ex post facto application of the subsequently adopted application, even assuming that, and I'm running out of time fast, the fact that she resorted to that was factually unsupported. He had nothing to do with it. That wasn't his motivation. His entire career as an activist was for animal rights. It had nothing to do with attempting to intimidate anybody. He was an animal rights activist, and that was what Cabell West was, to put an end to the suffering of the animals. Well, I guess I'm worried because I look very seriously at this. District courts sometimes do things that are not appropriate. Counsel gives them good advice. They change their mind. And now I have a chance to decide what to do on appeal. So I've got to look at my own decision again. And I look at Gall, and I look at the five reasons that I need to think about in whether I should really take this sentence apart. And I guess I'd like you to talk to me about those because there's five pretty good guidelines. Which one did she not meet? In my view, she did not properly calculate the guideline range. Well, but we're past that now. Pellet courts may not require extraordinary circumstances to impose a sentence. Pellet courts may not take the degree of variance into account and consider extent of a deviation. Guidelines are initial benchmark. A major departure should be supported by more than a minor one. Courts should adequately explain their reasoning. Abuse of discretion standard given the totality of the circumstances. I mean, those are the guidelines. Yes, and I'm out of time. Go ahead. Go ahead. The fundamental flaw here is that the equality that she claimed and the fairness that she claimed she was trying to achieve was based on a false premise. In other words, the person who participated in a single non-terrorist act, the Cabell West, is not to be proportionately compared to someone who had an eight-year career. That was the fundamental flaw that underlie her decision in sentencing here. And to accomplish that, in her own mind and very literally in the courtroom, she resorted to a totally artificial 12-level enhancement under 5K2.0 for an offense to which she had applied a single one-level increase in the only codefendant who also participated in Cabell West. And when we're doing these enhancements, as I say in our briefs, there are some that apply to the offense and there are some that apply to the offender. But if you and I, excuse me, I don't, if Mr. Pfeiffer and I... You couldn't be me and I. I mean, that doesn't bother me. ...jointly rob a bank, but he is a career offender, and therefore he is in Criminal History 6. And I have never done anything like that before. And the judge says, well, you know, Mr. Pfeiffer is going to get 18 years for this. Mr. Blackman, in order to be fair, I'm going to give you a 12-level enhancement on the offense to get you up to a much higher offense level so that I can then justify within the guidelines the sentence. That's what she did here. She artificially applied an enhancement to get to a level to justify a sentence as opposed to looking at the offense, measuring the level to which it was entitled to some enhancement. I would contend that one, as she gave Tubbs, was really appropriate. It was just, it was a terrible, horrible facility that... Well, she couldn't watch the video. Mr. Blackman, looking at what she said and what she did with regard to all of the defendants, why can't we conclude that ultimately the sentence is reasonable with regard to Mr. Paul because he didn't get 151 months. He got 51 months, which is down toward the bottom of the lowest sentences that were imposed for members of this conspiracy. And by his own admission, he burned down the plant. He did that arson. The guideline for that arson was 27 to 33 months for the facts of that case without any enhancements, without any downward departures, without anything else. That's the guideline. Now, I know that we are now told that the guideline range is not to be presumed to be reasonable. Now, you tell me where that leaves us in terms of deciding how do you measure reasonableness? You know, is it just, well, doesn't bother me? I don't think so. We do know the Supreme Court has told us that we have to give a substantial level of deference to a sentence imposed by the district judge if that sentence is adequately explained. And we've got a voluminous record here from which we can see how this district judge wrestled with the imposition of sentences and fashioning appropriate sentences for each defendant. It's certainly true. But in Cardi, again, this Court emphasized that a major departure should be supported by a more significant justification than a minor one. Here, it was a 12-level increase on an offense, base offense level of 18. That is a 350 percent, I calculated this morning, increase in the bottom of the guideline range. Okay. But without regard to guidelines, Congress said she could have given him 20 years for that offense. Not in a reasonable exercise of discretion. That would not have... That's the question, I guess. It comes down to reasonableness. Obviously, if it turns out that what reasonable means is if it's legal, it's reasonable, then all of our work has gotten a lot easier. I'm not sure we're that far yet. But I hear your argument. Let's hear from Mr. Brown. Thank you. And I apologize for going on. No, that's all right. We caused it. Yeah. May it please the Court. Jonathan Paul received a 51-month sentence for a $1.2 million arson that accomplished exactly what he intended. He put an international horse meat company out of business. The 51-month sentence was six months less than the government recommended. There was a six-level downward departure for substantial assistance in a situation where Mr. Paul didn't even name names of the people he had committed his crimes with. So the question now is whether under all the factors the Court's heard from myself and from Mr. Blackman as well as the district court, whether the sentence was unreasonable. The burden is on Mr. Paul to show how the sentence of 51 months is unreasonable in this case. And the standard after Gall and Kimbrough is an abuse of discretion. Now, this is a situation in which this defendant had three complete, virtually complete, sentencing hearings. The first one was, frankly, aborted because the court, on my suggestion, followed the old case by this court, which was also the rule in five other circuits, that she could simply consider the 60-month mandatory minimum, jump to that first. Now, of course, that's no longer good law after Booker. But it was a good-faith effort on her part to rely upon a case by this circuit. After she did that, she said 51 months is a reasonable sentence. I'll go back and I'll figure out the guidelines. She made it very clear the second time and especially clear the third time, two months later, that she would have given that 12-month increase regardless of this short cut she was taking with the old-type sentencing. But, Counselor, the argument is that, having said one time 51 months is reasonable, you can calculate it any way you want to. She was just trying to get to the 51 months, and, therefore, it isn't reasonable. Well, she was getting there. If you read the full transcript of the first sentencing, she was getting there. She had already made the 12-level enhancement finding. And then she said, regardless of that, I still have to deal with the 60-month mandatory minimum. And, of course, in the third sentencing, she made it clear also that there was nothing she did by going that short-cut way that precluded her from doing what she originally intended to do, which was to apply that 12-level increase. Mr. Pfeiffer, what's your response to Mr. Blackman's argument that the communique came out after the fire, after Mr. Paul had gone home, and, therefore, he can't be tagged with that as evidence of his motivation? I have two responses for that. First of all, the communique is evidence of what the intent was. Okay? There was plenty of evidence of what the intent was, what the objective was, the motivation against the plant. By Mr. Paul himself, at the time he pled guilty, he said, I did this to put the plant out of business. That's direct evidence of his intent to retaliate against Cabo West, the horse meat company, because they killed horses. That was the whole purpose of this act. The communique was sort of icing on the cake. Now, the communique was the statement of a co-conspirator in furtherance of the conspiracy. The conspiracy... And the Court won't know this overall in these cases. The communique became pretty important because that was their way to publicize it, to get the full effect of what they had done, so that they could, in effect, intimidate and coerce other people not to do the same type of business, whether it was the government or private business. Was there any action by Mr. Paul after the communique was issued? Any action by him in furtherance of the conspiracy, or it could be tagged to the conspiracy? I'm not aware of any. I'm not either, and that's really what raises the question, because the argument being made on his behalf is that his motivation wasn't the same, and he didn't do anything after the communique was issued, so how can we know the communique really speaks for him or is in furtherance of conspiracy in his mind? Well, as I said, the communique essentially confirmed what he admits, that that was his purpose, was to put the plant out of business, and he accomplished that, obviously. So the communique simply restated that objective. He did make a statement. This is in the record, too, a statement to the Oregonian where he, a while later, referred to that as a successful arson. He didn't admit his own involvement in it, but it was the type of thing that he approved of. Mr. Blackman tries to paint Jonathan Paul as having a career in the animal rights field. Well, that's true, but by his own admission, he burned the veterinary school at the University of California, Davis. He broke into and vandalized the inside of a laboratory at the University of Oregon. He took part in similar activity at the University of Arizona in which an arson resulted. All of these are additional criminal acts that were considered and not denied by Mr. Paul and were considered by the court. The comparison with Mr. Tubbs is interesting because it shows the detail to which the court went to try to compare co-conspirators. And I think the court was obligated to try to compare and be proportionate among the co-conspirators because they were all pleading guilty to a conspiracy count as well as individual substantive counts. And the court explained at great length why Tubbs only got one level as an upward departure after she had completely calculated his guidelines, which in his case involved several applications of 3A1.4, the terrorism guideline. So he was already much higher than most of the other defendants, and she added that one level to show that not just Cabell West but Superior Lumber and Childers Meat and other fires that he was involved in were also terroristic-type acts, even though they didn't qualify under the terrorism guideline. So you're not comparing apples and oranges here, really. You're looking at somebody who committed an act that's analogous to the terrorism guideline, Mr. Paul, and then you're looking at Mr. Tubbs, who did the same thing but did a lot more, and all the court was trying to do and give him, give Tubbs some increase up to level 40. She was trying to stay within reasonable limits here because of the plea agreement and because of the downward departure that she was going to give as well for substantial assistance. Am I correct? I asked Mr. Blackman this question. The scope of the conspiracy, as it was framed in your indictment, basically was to further the aims of this group through these individual acts of arson and so on, and what the court was doing was saying, Look, I don't care whether the victim is a private entity or a government entity. The acts are the same for sentencing purposes. Right. That comes up more in the Tankersley appeal, which comes next, Your Honor, but that's exactly what she did because she didn't think it was fair to impose these big increases just because the government was the target as opposed to private parties, and that's exactly what the Sentencing Commission did in 2002 when it wrote Application Note 4. It applied the same thing to private parties that it's applicable to the government. As far as the ex post facto element here, 5K2.0 preexisted this case, and that's the mechanism the court used, as well as its general authority under 3553A to vary the sentence, so it's hard to say it's an ex post facto application when the court had that preexisting authority to depart for reasonable grounds, and that's what it did here. Thank you. I think I've exhausted my time. Go ahead. Thank you. With respect to the motivational element here and her application of that increase based on the fact that she thought there was evidence to support his purpose to be a terrorism-like purpose, that's just not the record, and I'd just like to finish by urging the court to look at what he said in connection with his plea where he never suggests that the purpose was to put Cabell West out of business and what he said it is sentencing, and I'm just going to read. This is in ER 161. I accept full responsibility and blame no one but myself for my actions. I am responsible for any and all decisions I made, and I am sorry for the pain and hardships that have been suffered by the victims of my crimes. I am embarrassed, and I am ashamed. Ten years ago, I was filled with horror and despair over the inhumane slaughter of horses for human consumption. I participated in the arson because of that overwhelming desperation and desire to spare, excuse me, and the reason he says excuse me is that he was very emotional at that moment, to spare these sentient beings from unimaginable torture and cruelty. This had nothing to do with retaliating against private enterprise or interstate commerce. It had to do with putting an end to the suffering. I thought these horses came primarily from BLM lands. These were wild horses for the most part. No, there was subsequent indication that the BLM was auctioning off two people. You know, they have surplus Mustangs, and they auctioned off some of those which ended up being purchased. I think the indication was by BLM employees for very little, and then they would take them to slaughter. But I don't think there was anything in the record to indicate that the animals at issue at Cabell West were from government auctions of BLM horses. Okay. Thank you very much. Thank you very much. The case just argued is submitted, and we will next hear argument in the related case of the United States versus Campbell Tankersley. Thank you.
judges: Tallman, Clifton, Smith